RECEIPT # _____
AMOUNT $ _____
SUMMONS ISSUED _____
LOCAL RULE 4 1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE _____

# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH MARTIN, On Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> VIISAGE TECHNOLOGY, INC., DENIS K. BERUBE, BERNARD BAILEY and WILLIAM AULET, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

No.

CLASS ACTION

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

# 05 - 10577 MLW

MAGISTRATE JUDGE _____

DEMAND FOR JURY TRIAL

## SUMMARY AND OVERVIEW

1.      This is a securities class action on behalf of all persons who purchased the publicly traded securities of Viisage Technology, Inc. ("Viisage" or the "Company") between May 3, 2004 and March 2, 2005 (the "Class Period"), against Viisage and certain of its senior officers and directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.      Viisage delivers technology identity solutions for governments, law enforcement agencies and businesses concerned with enhancing security, reducing identity theft, providing access control and protecting personal privacy. The Company's business involves two related segments: secure credentials and biometrics.

3.      By the beginning of the Class Period, the defendants were concerned that the Company's continued losses would further erode the value of their stock option holdings and preclude them from being able to raise any additional capital to fund the Company's operations. In fact, by late spring 2004, the Company had only $9 million left in the Company's coffers. Defendants knew that unless they could immediately reinflate the Company's share price and complete an offering of Viisage stock, the Company's ability to continue as a going concern would be in jeopardy. Given the Company's ongoing losses, defendants also knew that completing an offering was imperative for the Company's survival. If defendants failed to generate the necessary interest in the offering, they ran the risk that the bankers would convert the offering into a "best efforts" offering, not a "firm commitment offering" as defendants had tentatively agreed to with the Company's bankers.[1] There was also the risk that the bankers would decline to participate in the offering if the Company's shares or its prospects showed weakness. Defendants were also keenly

---

[1]      Unlike a "firm commitment offering," in a "best efforts offering" a company is not guaranteed by the bankers that all shares will be sold.

aware that by representing that the Company *would* report millions in profits in future quarters, they would be able to attract new investors. The Company had not seen a quarterly profit in at least three years and defendants knew that the Company's Q4 2004 would be no different. The Company was on track to report continued losses through FY2004 and beyond. Thus, the key to defendants' plan to reinvigorate interest in (and ultimately inflate) the Company's shares would be to convince prospective shareholders that the Company was on the verge of its first profitable quarter in years.

4.     In an effort to foster substantial investor interest, defendants, together with their investment bankers, scrambled to make as many presentations about Viisage as possible. On May 5, 2004, defendants presented the Company and its prospects at the J.P. Morgan 32nd Annual Tech and Telecom conference in San Francisco. On May 18, 2004, defendants presented again at the American Electronics Association Micro Cap Financial Conference in Monterey, California. On May 19, 2004, defendants presented for a third time that month at the Piper Jaffray Technology Conference in New York City.

5.     At multiple times during the Class Period, defendants continued to *reassure* prospective investors of profitability and, in fact, actually *increased* the Company's profitability estimates for 2004, stating:

- "This progress provides us with the confidence to confirm our guidance for 2004. We continue to expect revenue between $60-63 million and EBITDA of $11-12 million."

- "Company increases guidance for 2004."

- "The Company's performance for the third quarter, combined with our accomplishments so far this quarter, give us the confidence to increase both our revenue and EBITDA guidance for 2004."

- "[W]e are pleased with the terms of our acquisition of Imaging Automation, since we believe this transaction will be accretive on a net income, EBITDA and EPS basis in

2005, and will help us continue to drive revenue and profit growth not only this year, but for many years to come."

- "Viisage is increasing its guidance for 2004, with annual revenue now anticipated to be between $66-68 million, increased from $60-63 million, and EBITDA anticipated to be between $11.5-12.5 million, increased from EBITDA of $11-12 million."

6.    Defendants' "visions" and "tune" changed just prior to the end of its final audit stages for 2004 *but after* consummating the Company's Offering. The Company's investors were in for a rude awakening. On March 2, 2005, after the market closed, the Company issued a press release entitled "Viisage Reports Fourth Quarter 2004 Results." The press release stated in part:

> In connection with the preparation of the Company's consolidated financial statements for the year ended December 31, 2004, the Company determined that it had an internal control deficiency that constitutes a 'material weakness' as defined by the Public Company Accounting Oversight Board's Accounting Standard No. 2. The Company has concluded that it had insufficient personnel resources and technical accounting expertise within the accounting function to resolve non-routine or complex accounting matters. As a result, management will be unable to conclude that the Company's internal controls over financial reporting are effective as of December 31, 2004. Therefore, BDO Seidman LLP, the Company's external accounting firm, will issue an adverse opinion with respect to the effectiveness of the Company's internal controls over financial reporting. In addition, as part of the Sarbanes-Oxley Section 404 compliance review, the Company is in the process of reviewing all of its other key internal control processes as well. While the evaluation is ongoing, management believes that it will likely conclude that the Company had significant deficiencies, which could constitute a material weakness, in the control processes around information technology systems as well.

7.    The Company's shares plummeted 25% to $4.50 per share on March 3, 2005, in response to this news, causing shareholders to lose tens of millions of dollars, as well as calling into question the veracity of the defendants' prior statements. On March 17, 2005, shareholders were again stunned by alarming news when the Company admitted that it could not file its annual report on time. Although required by SEC regulations, the Company admitted it could not file a "complete and accurate annual report." The annual report is very important to investors. In fact, it is the first and only time the Company's financials are *certified* by an auditor. With this news, the

Company's shares were once again slammed with sell orders as investors sought to recover whatever was left of their investment in Viisage.

8.    The true facts, which were known by each of the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    the Company lacked requisite internal controls, and, as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated facts;

(b)    contrary to defendants' claims of profitability for the fourth quarter of 2004, the Company was actually on track to report losses;

(c)    the Company's information technology systems were materially compromised, which also materially impacted the Company's ability to issue accurate financial statements and projections;

(d)    defendants concealed these deficiencies for multiple quarters in order to: (i) delay the cost of implementing the proper system controls and thereby temporarily inflate the Company's net income; and (ii) provide defendants with a pliable system that would allow them to cause the Company to report financial results irrespective of their accuracy; and

(e)    as a result of (a)-(d) above, the Company's projections for fiscal year ("FY") 2004 were grossly inflated.

9.    As a result of the defendants' false statements, Viisage's stock price traded at artificially inflated levels during the Class Period, which allowed the Company and its top officers and directors to sell more than $39 million worth of Company shares in the Offering. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales of the Company's shares sending them down 60% from its Class Period high. In all,

- 4 -

defendants' scheme caused hundreds of millions of dollars in lost market capitalization. This dramatic decline in share price was followed by an immediate outcry from Wall Street analysts (including Unterberg Towbin and JMP Securities) who collectively downgraded the Company's shares.

## JURISDICTION AND VENUE

10.     Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

11.     (a)     Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made in or issued from this District.

(b)     The Company's principal executive offices are located at 296 Concord Road, 3rd Floor, Billerica, MA 01821, where the day-to-day operations of the Company are directed and managed.

## THE PARTIES

12.     Plaintiff Joseph Martin purchased Viisage publicly traded securities as described in the attached certification and was damaged thereby.

13.     Defendant Viisage delivers technology identity solutions for governments, law enforcement agencies and businesses concerned with enhancing security, reducing identity theft, providing access control and protecting personal privacy. The Company's business involves two related segments: secure credentials and biometrics. The secure credentials solutions segment involves the design, development, marketing and implementation of integrated software and hardware solutions that produce identification credentials utilizing face recognition and other biometric technologies. The focus of the biometric technology solutions segment is primarily on applications designed to deter criminal and terrorist activities, including government research and development contracts.

- 5 -

14.    Defendant Denis K. Berube ("Berube") is, and at all relevant times was, the Chairman of the Board of Viisage. During the Class Period, Berube assisted in the Company's sale of $39.6 million worth of the Company's securities.

15.    Defendant Bernard Bailey ("Bailey") is, and at all relevant times was, the President, Chief Executive Office ("CEO") and a director of Viisage. During the Class Period, Bailey assisted in the Company's sale of $39.6 million worth of the Company's securities.

16.    Defendant William Aulet ("Aulet") is, and at all relevant times was, Chief Financial Officer ("CFO") of Viisage. During the Class Period, Aulet assisted in the Company's sale of $39.6 million worth of the Company's securities.

17.    The individuals named as defendants in ¶¶14-16 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Viisage's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein at ¶¶24, 27-30, 33 and 35, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SCIENTER

18.     In addition to the above-described involvement, each Individual Defendant had

knowledge of Viisage's problems and was motivated to conceal such problems. Aulet, as CFO,

was responsible for financial reporting and communications with the market. Many of the internal

reports showing Viisage's forecasted and actual growth were prepared by the finance department

under Aulet's direction. Defendants Bailey, as CEO and President, and Berube, as Chairman, were

responsible for the financial results and press releases issued by the Company. Each Individual

Defendant sought to demonstrate that he could lead the Company successfully and generate the

growth expected by the market, including a profitable Q4 2004.

19.     Defendants were motivated to engage in the fraudulent practices alleged herein in

order to obtain financing for the Company at the expense of the purchasers in the Company's

Offering.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

20.     Each defendant is liable for (i) making false statements, *or* (ii) failing to disclose

adverse facts known to him about Viisage. Defendants' fraudulent scheme and course of business

that operated as a fraud or deceit on purchasers of Viisage publicly traded securities was a success,

as it (i) deceived the investing public regarding Viisage's prospects and business; (ii) artificially

inflated the prices of Viisage's publicly traded securities; (iii) allowed defendants to obtain larger

bonuses which were directly tied to the performance of Viisage; (iv) allowed defendants to arrange

to sell and actually sell in excess of $39 million worth of Viisage shares at artificially inflated

prices; and (v) caused plaintiff and other members of the Class to purchase Viisage publicly traded

securities at inflated prices.

## BACKGROUND

21.    Viisage delivers technology identity solutions for governments, law enforcement agencies and businesses concerned with enhancing security, reducing identity theft, providing access control and protecting personal privacy. The Company's business involves two related segments: secure credentials and biometrics.

22.    In the Spring of 2004, defendants knew that the Company lacked the requisite internal controls to make accurate projections. Defendants also were aware that due to the fact that the Company's information technology systems were materially compromised, their ability to "report" actual results was even questionable.

23.    The defendants concealed these deficiencies for multiple quarters in order to delay the cost of implementing the proper system controls. Instead, defendants were afforded with a pliable system that would allow them to manipulate the Company's internal financial models at will. However, nearly a year passed before the absence of real internal controls was made public.

### DEFENDANTS' FALSE AND MISLEADING
### STATEMENTS ISSUED DURING THE CLASS PERIOD

24.    On May 3, 2004, the Company issued a press release entitled "Viisage Reports First Quarter 2004 Results; Revenues Increase 50% Year-over-Year Reflecting Momentum and Acquisitions; Company Raises Revenue and Earnings Guidance." The press release stated in part:

> Viisage, a leading provider of advanced technology identity solutions, today announced results for the first quarter ended March 28, 2004.
>
> Revenues for the first quarter of 2004 totaled $12.26 million, the third consecutive record quarterly attainment, up from $8.16 million in the comparable period last year, as reported in accordance with the change in accounting principle. The net loss for the first quarter of 2004 was $1.63 million, or $0.05 per basic and diluted share, compared to the reported net loss of $2.37 million, or $0.12 per basic and diluted share, for the first quarter of 2003, which excludes the one-time charge of $12.13 million or $0.60 per share that the Company recorded in connection with its change in accounting principle. Including the charge, the net loss for the first quarter of 2003 was $14.50 million or $0.72 per share on a basic and diluted basis.

On December 30, 2003, Viisage adopted new accounting rule EITF 00-21, "Accounting for Revenue Arrangements with Multiple Deliverables," which pertains to revenue recognition for certain long-term contracts, such as Viisage's state drivers' licenses, retroactively to January 1, 2003.

"The first quarter of 2004 was filled with milestones that concretely demonstrate the transformation of our company into an identity solutions company, combining biometrics, secure credentials, and other technologies to solve a wide range of customer problems," said Bernard Bailey, president and chief executive officer. "We significantly expanded our leadership positioning in biometrics with the successful acquisition and integration of ZN Vision Technologies AG, which led to key strategic wins including the U.S. Department of State Diversity Visa Program."

"We also greatly improved our secure credentialing capabilities this quarter through the acquisition and integration of Trans Digital Technologies Corporation ('TDT') in February," Bailey added. "The Department of Defense's subsequent selection of Viisage to provide the technology for the Common Access Card, the U.S. government's largest smart card program, added significant traction in the U.S. Federal government market, one of our strategic target markets. At the same time, we kept driving top-line revenue growth and made progress in generation of EBITDA (earnings before interest, taxes, depreciation and amortization). While results fell short of analysts' estimates due to timing of a single shipment to the Department of State of $1.6 million, which was recognized during the first week of April, we are making excellent progress in executing on our vision and strategy. This operational achievement provides us with the confidence to increase our outlook for the year. *Based upon what we have accomplished so far, and what we see in the sales pipeline, we are increasing our annual revenue guidance from $57 - $60 million to $60 - $63 million and our EBITDA guidance from over $10 million to $11 - $12 million*."

Bailey concluded, "*As we look to the balance of 2004, we believe Viisage is extremely well-positioned to compete successfully for emerging opportunities, both domestically* and *internationally*. Our goal is to provide our customers with advanced technology identity solutions for applications such as enhanced drivers' licenses, border control and criminal booking and investigative systems."

Bill Aulet, Viisage's chief financial officer, added, "Viisage significantly improved its financial performance on a year-over-year basis. This was a result of a revenue increase of 50% as well as a robust gross margin improvement of 11 points or 63%. EBITDA shifted from a loss of $229,000 to a positive contribution of $1.06 million. Cash at the end of the quarter totaled $12.40 million. *In addition to our increased forecasts for revenue and EBITDA, today we are also updating our guidance for net income, which we now expect to be no more than a net loss of $0.5 million, compared to our earlier forecast of a net loss of no more than $3 million*." [Emphasis Added]

- 9 -

25.    The Company's shares soared nearly 25% immediately following defendants' positive projections.

26.    Defendants appeared at numerous conferences in May 2004 to generate interest in the Company's Offering. On May 5, 2004, defendants presented the Company and its prospects at the JP Morgan 32nd Annual Tech and Telecom Conference in San Francisco. On May 18, 2004, defendants presented again at the American Electronics Association Micro Cap Financial Conference in Monterey, California. On May 19, 2004, defendants presented for a third time that month at the Piper Jaffray Technology Conference in New York City.

27.    On June 22, 2004, just weeks after the Company's last high-profile presentation, the Company issued a press release entitled "Viisage Announces Proposed Public Offering of Common Stock." The press release stated in part:

Viisage, a provider of advanced technology identity solutions, today announced that it has filed a registration statement with the Securities and Exchange Commission for the sale of 7,200,000 newly-issued shares of its common stock in an underwritten public offering.

28.    On July 22, 2004, the Company issued another press release relating to the Offering entitled "Viisage Launches Public Offering of Common Stock." Defendants needed to generate as much publicity about the offering as possible. The press release stated in part:

Viisage, a provider of advanced technology identity solutions, today initiated the public offering of 7,200,000 newly-issued shares of its common stock in an underwritten public offering. The offering covers an additional 300,000 shares being sold by certain shareholders of Viisage.

29.    On July 22, 2004, the Company issued a third press release entitled "Viisage Reports Second Quarter 2004 Results; Revenues increase 85% year over year; *Company affirms annual guidance*." The press release stated in part:

Viisage, a leading provider of advanced technology identity solutions, today announced results for the second quarter ended June 27, 2004.

- 10 -

Revenues for the second quarter of 2004 totaled $16.28 million, the fourth consecutive quarter in which revenues set a new company record, up 85% from $8.79 million in the comparable period last year, as reported in accordance with the change in accounting principle described below. The net loss for the second quarter of 2004 was $317,000, or $0.01 per basic and diluted share, compared to the net loss of $1.38 million, or $0.07 per basic and diluted share, for the second quarter of 2003.

Separately, the Company announced today that it has reached a settlement with the Department of Motor Vehicle Safety for the State of Georgia, designed to enable the state to end its litigation with a competitor of Viisage over the state drivers' license contract awarded to Viisage in 2002. The state has confirmed that it intends to issue a new request for proposals for its drivers' license system later this year.

On December 30, 2003, Viisage adopted new accounting rule EITF 00-21, "Accounting for Revenue Arrangements with Multiple Deliverables," which pertains to revenue recognition for certain long-term contracts, such as Viisage's state drivers' licenses, retroactive to January 1, 2003.

"We are very pleased with our financial and operational performance during the second quarter, our first full quarter including the results of our recent acquisitions, as we solidified our position as a leading identity solutions company," said Bernard Bailey, president and CEO of Viisage. "*We quickly integrated the acquisition of Trans Digital Technologies (TDT), announced in the first quarter, culminating in a critical contract win of the Department of Defense Common Access Card program, which is expected to generate more than $10 million in revenue over this year and next.* We also demonstrated continued traction in the important law enforcement market, with the expansion of our work to a mobile solution in Pinellas County, Florida; a new contract in Jefferson County, Alabama; and another contract with a major metropolitan law enforcement organization."

Bailey concluded, "We believe we are executing well on our strategy to provide our customers with the full lifecycle of identity solutions, and we think we are well positioned to continue our growth, both organically and through partnerships and select acquisitions. We also believe that the action announced today to help end the stalemate in Georgia will enable us to move forward and focus our resources on a wide range of current opportunities around the world that fit our capabilities strategically, while still providing us with the potential to win that drivers' license contract again when the new request for proposals is issued this year."

Bill Aulet, Viisage's chief financial officer, added, "*Viisage continued to significantly improve its financial performance in the past quarter*, leveraging an 85% revenue increase on a year-over-year basis along with tight expense controls to post gross margins of 31%, up substantially on an annual and sequential basis. EBITDA (earnings before interest, taxes, depreciation and amortization) grew from $709,000 in the second quarter last year to $3.14 million in the same period this year. Cash at the end of the quarter totaled approximately $12.62 million. *This progress*

*provides us with the confidence to confirm our guidance for 2004. We continue to expect revenue between $60-63 million and EBITDA of $11-12 million.*"
[Emphasis Added]

30.    On August 5, 2004, the Company issued a press release entitled "Viisage Prices

Public Offering of Common Stock." The press release stated in part:

Viisage, a provider of advanced technology identity solutions, today announced an underwritten public offering of 7,200,000 newly-issued shares of its common stock at a price per share of $5.50. The offering covers an additional 300,000 shares being sold by certain shareholders of Viisage. Gross proceeds to Viisage will be approximately $39.6 million, and the proceeds to the selling shareholders will be approximately $1.7 million.

31.    Immediately following the Offering, trading volume in the Company's securities

began to dry up and the Company's shares began to trade in a narrow range for several months.

Only by increasing the Company's projections, though already inflated, could defendants reignite

interest in and amplify the volume and price of the Company's securities. This was precisely what

defendants sought to do next.

32.    By the beginning of October 2004, the Company's shares were barely trading above

the Offering price of $5.50 per share. This lackluster post-offering price/trading would serve as a

barometer for future investment banking interest, should the Company attempt to raise monies in

the future with the assistance of another investment bank. This would even affect the Company's

existing relationships with JP Morgan and Piper Jaffray, which assisted defendants' in their August

2004 Offering. Defendants' next opportunity to inflate the Company's shares would be in its Q3

2004 financial report. Defendants did not hesitate.

33.    On October 25, 2004, the Company issued a press release entitled "Viisage Reports

Record Results for Third Quarter 2004; Revenues increase 97% and *Company increases guidance

for 2004.*" The press release stated in part:

Viisage, a leading provider of advanced technology identity solutions, today announced results for the third quarter ended September 26, 2004.

- 12 -

Revenues for the third quarter of 2004 totaled $19.91 million, marking the fifth consecutive quarter in which revenues set a Company record, up 97% from $10.11 million in the comparable period last year, as reported in accordance with the change in accounting principle described below. The net income for the third quarter of 2004 was $198,000, or $0.00 on a basic and diluted share basis, compared to a net loss of $389,000, or $0.02 per basic and diluted share, for the third quarter of 2003. The Company's third quarter results do not reflect any contribution from the recent acquisition of Imaging Automation (iA); financial results for iA and Viisage will be combined from October 5, 2004, the date the transaction was completed.

On December 30, 2003, Viisage adopted new accounting rule EITF 00-21, "Accounting for Revenue Arrangements with Multiple Deliverables," which pertains to revenue recognition for certain long-term contracts, such as Viisage's state drivers' licenses, retroactive to January 1, 2003.

*"Viisage made important progress, financially and operationally, during the third quarter, as we expanded our product suite for identity solutions and produced a profitable quarter," said Bernard Bailey, president and CEO of Viisage. "We have greater traction with existing and prospective customers in a wide range of markets, and feel that we are well positioned to continue our growth. We were pleased with the* reception *given Viisage by the financial community despite the difficult market environment that existed during our recently completed follow-on offering, and plan to use the proceeds to further build our market leadership in identity solutions. With the addition of critical proofing and document authentication capabilities from iA, we are offering customers a comprehensive technology solution that truly addresses their needs."*

*Bailey concluded, "The Company's performance for the third quarter, combined with our* accomplishments *so far this quarter, give us the confidence to increase both our revenue and EBITDA guidance for 2004."*

*Bill Aulet, Viisage's chief financial officer, added, "Viisage continued to significantly improve its* financial performance and strengthen its balance sheet in the past quarter while maintaining the necessary financial flexibility*. Our strong revenue performance coupled with careful expense management enabled us to produce our first profitable quarter on a GAAP basis in several years. At the same time, our focus on growing EBITDA (earnings before interest, taxes, depreciation and amortization) proved successful as it increased to $3.4 million this past quarter, from $1.5 million in the same quarter last year. Lastly, we are pleased with the terms of our acquisition of Imaging Automation, since we believe this transaction will be accretive on a net income, EBITDA and EPS basis in 2005, and will help us continue to drive revenue and profit growth not only this year, but for many years to come."* [Emphasis Added]

- 13 -

34.    Defendants' attempts to reignite the Company's share price by increasing their projections for the Company's future worked. The Company's October 25, 2004 announcement pushed the Company's shares back above $7.00 per share.

35.    On February 7, 2005, the Company issued a press release entitled "*Viisage Provides Preliminary Full Year 2004 Financials; Company meets revenue guidance; net income and EBITDA below expectations.*" The press release stated in part:

> Viisage, a leading provider of advanced technology identity solutions, announced today that, on a preliminary basis, it expects full year 2004 revenues to fall within the range of the Company's latest guidance. Earnings before interest, taxes, depreciation and amortization (EBITDA) and net income are expected to fall below guidance. The expected shortfall is primarily due to several non-recurring factors, including a non-cash impairment charge of $2 million in connection with a settlement involving the Company's previous drivers' license contract with the Georgia Department of Motor Vehicle Safety, which had been litigated. This charge was a result of a judge's ruling in the fourth quarter, which the Company is currently appealing.
>
> *In issuing its results for the third quarter of 2004 on October 25, 2004, the Company had increased its guidance for 2004, anticipating revenues for the full year in the range of $66-68 million, with EBITDA between $11.5-12.5 million, while maintaining net income guidance as a loss of $1.5 million for the year.*
>
> Based upon the preliminary review of its financial results for the year, Viisage now expects revenues of approximately $66-67 million, and EBITDA of approximately $8-9 million. Net income, which includes the $2 million impairment charge related to the terminated Georgia contract, is anticipated to be a loss of approximately $7-8 million. [Emphasis Added]

36.    On this startling news, suggesting that defendants' projections were inaccurate, the price of the Company's shares plummeted almost 20% and was just hovering above the August 2004 Offering price. This news was just the beginning of more news contradicting defendants' earlier statements.

37.    On March 2, 2005, after the market closed, the Company issued a press release entitled "Viisage Reports Fourth Quarter 2004 Results; 81 percent annual revenue increase over

2003, with improved cash generation Company provides outlook for 2005." The press release

stated in part:

> Viisage, a leading provider of advanced technology identity solutions, today reported final results for its fourth quarter and year ended December 31, 2004. For the fourth quarter, revenues were $19.0 million, an 84 percent increase over $10.3 million in the same period last year. The net loss for the fourth quarter of 2004 was $5.2 million, or $0.11 per fully diluted share, which includes the impact of the previously disclosed $2 million impairment charge of contract assets related to the terminated State of Georgia drivers' license contract, and a $900,000 non-cash deferred tax expense. In the 2003 fourth quarter, the Company reported a net loss of $1.4 million or $0.06 per fully diluted share. The 2004 fourth quarter results include the contribution from the acquisition of Imaging Automation, Inc. (iA), which was completed on October 5, 2004.

> For the full year 2004, revenues were $67.5 million, an 81 percent increase over revenues of $37.4 million in 2003. The Company's net loss for 2004 was $7.0 million, or $0.18 per basic and diluted share, compared to a net loss of $17.7 million, or $0.82 per fully diluted share, in the prior year, which includes the impact of the one-time charge of $12.1 million or $0.56 per share that the Company recorded in connection with a change in accounting principle. On December 30, 2003, Viisage adopted new accounting rule EITF 00-21, "Accounting for Revenue Arrangements with Multiple Deliverables," which pertains to revenue recognition for certain long-term contracts, such as Viisage's state drivers' licenses contracts, retroactive to January 1, 2003.

> On February 7, 2005, Viisage announced preliminary results for the fourth quarter of 2004, indicating that while the Company achieved its revenue guidance, its net income and EBITDA fell short of expectations reflecting a number of primarily non-recurring factors.

> "We are very pleased with our top line growth over the past year, as well as our substantial progress in increasing the cash generation capabilities of our business, at a time when most companies in our space are not producing cash," said Bernard Bailey, president and chief executive officer of Viisage. "This past year represented a significant transformation for Viisage. Completing three major acquisitions, strengthening our balance sheet and expanding our customer base have better positioned us to compete in the burgeoning identity solutions marketplace. We are convinced that our marketplace offers exciting opportunities for Viisage. As a company, we are committed to enhancing our leadership position by continuing to invest in our business going forward."

38.    Also, in connection with this March 2, 2005 release, the Company revealed:

> In connection with the preparation of the Company's consolidated financial statements for the year ended December 31, 2004, the Company determined that it

had an internal control deficiency that constitutes a 'material weakness' as defined by the Public Company Accounting Oversight Board's Accounting Standard No. 2. The Company has concluded that it had insufficient personnel resources and technical accounting expertise within the accounting function to resolve non-routine or complex accounting matters. As a result, management will be unable to conclude that the Company's internal controls over financial reporting are effective as of December 31, 2004. Therefore, BDO Seidman LLP, the Company's external accounting firm, will issue an adverse opinion with respect to the effectiveness of the Company's internal controls over financial reporting. In addition, as part of the Sarbanes-Oxley Section 404 compliance review, the Company is in the process of reviewing all of its other key internal control processes as well. While the evaluation is ongoing, management believes that it will likely conclude that the Company had significant deficiencies, which could constitute a material weakness, in the control processes around information technology systems as well.

39.    On this news, the Company's shares plummeted another 17% to $4.50 per share, well below the August 2004 Offering price and 50% lower than the Class Period high. These disastrous revelations, when concealed, allowed defendants to raise over $39 million, and once disclosed, erased over $150 million in market capitalization.

40.    The true facts, which were known by each of the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    the Company lacked requisite internal controls, and, as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated facts;

(b)    contrary to defendants' claims of Q4 2004 and/or FY 2004 profitability, the Company was actually on track to report losses;

(c)    the Company's information technology systems were materially compromised, which also materially impacted the Company's ability to issue accurate financial statements and projections;

(d)    defendants concealed these deficiencies for multiple quarters in order to: (i) delay the cost of implementing the proper system controls and thereby temporarily inflate the

- 16 -

Company's net income; and (ii) provide defendants with a pliable system that would allow them to cause the Company to report financial results irrespective of their accuracy; and

(e)    as a result of (a)-(d) above, the Company's projections for FY 2004 were grossly inflated.

41.    As a result of the defendants' false statements, Viisage's stock traded at artificially inflated levels during the Class Period, which allowed the Company and its top officers and directors to sell more than $39 million worth of Company shares in the Offering. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales of the Company's shares sending them down 60% from their Class Period high. In all, defendants' scheme caused hundreds of millions of dollars in lost market capitalization. This dramatic decline in share price was followed by an immediate outcry from Wall Street analysts (including Unterberg Towbin and JMP Securities) who collectively downgraded the Company's shares.

42.    Then, weeks later, on March 17, 2005, the Company's shares were pushed even further into decline as defendants admitted they could not and would not be able to file an accurate annual report on time.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

43.    Plaintiff incorporates ¶¶1-42 by reference.

44.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

- 17 -

45.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Viisage publicly traded securities during the Class Period.

46.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Viisage publicly traded securities. Plaintiff and the Class would not have purchased Viisage publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

47.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Viisage publicly traded securities during the Class Period.

### COUNT II

#### For Violation of §20(a) of the 1934 Act
#### Against All Defendants

48.    Plaintiff incorporates ¶¶1-47 by reference.

49.    The Individual Defendants acted as controlling persons of Viisage within the meaning of §20(a) of the 1934 Act. By reason of their positions as officers and/or directors of Viisage, and their ownership of Viisage stock, the Individual Defendants had the power and authority to cause Viisage to engage in the wrongful conduct complained of herein. Viisage

controlled each of the Individual Defendants and all of its employees. By reason of such conduct, the Individual Defendants and Viisage are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

50.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Viisage publicly traded securities (the "Class") on the open market during the Class Period. Excluded from the Class are defendants.

51.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Viisage has more than 47 million shares of stock outstanding, owned by hundreds if not thousands of persons.

52.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the 1934 Act was violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     Whether the prices of Viisage's publicly traded securities were artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

53.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

54.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

55.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to FRCP 23;

B.    Awarding plaintiff and the members of the Class damages, interest and costs;

C.    Awarding plaintiff reasonable costs and attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  March 24, 2005                    SHAPIRO HABER & URMY LLP
                                          THOMAS G. SHAPIRO
                                          THEODORE M. HESS-MAHAN


                                          Theodore M. Hess-Mahan
                                          53 State Street
                                          Boston, MA  02109
                                          Telephone:  617/439-3939
                                          617/439-0134 (fax)

- 20 -

LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
401 B Street, Suite 1600
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)


LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN (SR-7957)
DAVID A. ROSENFELD (DR-7564)
MARIO ALBA, JR. (MA-7240)
200 Broadhollow Road, Suite 406
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)


Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

JOSEPH MARTIN ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. .   Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 2 - 11 - 05 | 1,000 | 5.81 |
| | | |
| | | |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| | | |
| | | |
| | | |

5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below:

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

VIISAGE

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _18th_ day of _March_, 2005.

_JOSEPH MARTIN_

VIISAGE

®JS 44  (Rev. 3/99)                                          CIVIL COVER SHEET                  05 - 0577 MLW

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a)   PLAINTIFFS**
JOSEPH MARTIN

**DEFENDANTS**
VISAGE TECHNOLOGY, INC., BERNARD BAILEY, WILLIAM K. AULET and DENIS K. BERUBE

**(b)** County of Residence of First Listed Plaintiff    OUT OF STATE
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Theodore M. Hess-Mahan          Tel: (617) 439-3939
Shapiro Haber & Urmy LLP        Fax: (617) 439-0134
53 State Street
Boston, MA 02109

Attorneys (If Known)
Mitchell H. Kaplan              Tel: (617) 248-5000
Choate Hall & Stewart LLP       Fax: (617) 248-4000
Exchange Place
Boston, MA 02109

**II. BASIS OF JURISDICTION**    (Place an "X" in One Box Only)

☐ 1  U.S. Government          X 3  Federal Question
      Plaintiff                     (U.S. Government Not a Party)

☐ 2  U.S. Government          ☐ 4  Diversity
      Defendant                    (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                          and One Box for Defendant)

|                                      | PLF | DEF |                                                    | DEF | DEF |
|--------------------------------------|-----|-----|----------------------------------------------------|-----|-----|
| Citizen of This State                | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State             | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation                                  | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT**    (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|----------|-------|--------------------|------------|----------------|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | X 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | | | Determination Under |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | or Defendant) | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS—Third Party | State Statutes |
| | | ☐ 550 Civil Rights | Security Act | 26 USC 7609 | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

**V. ORIGIN**    (PLACE AN "X" IN ONE BOX ONLY)

X 1 Original       ☐ 2 Removed from      ☐ 3 Remanded from       ☐ 4 Reinstated      ☐ 5 Transferred from     ☐ 6 Multidistrict     ☐ 7 Appeal to District
    Proceeding          State Court           Appellate Court          or                    another district         Litigation            Judge from
                                                                       Reopened              (specify)                                      Magistrate Judgment

**VI. CAUSE OF ACTION**    (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)
15 USC §§78j(b) and 78t(a) and 17 CFR 240.10b-5

**VII. REQUESTED IN**    X  CHECK IF THIS IS A CLASS ACTION       DEMAND $ 0       CHECK YES only if demanded in complaint:
**COMPLAINT:**            UNDER F.R.C.P. 23                                           JURY DEMAND:     X Yes   ☐ No

**VIII. RELATED CASE(S)**
**IF ANY**    (See instructions):  JUDGE WOLF          DOCKET NUMBER  05-cv-10438 MLW

DATE  5/24/2005          SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) Joseph Martin v. Viisage Technology, Inc. et al.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

___  I.      160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

_X_  II.     195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
             740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.      for patent, trademark or copyright cases

___  III.    110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
             315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
             380, 385, 450, 891.

___  IV.     220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
             690, 810, 861-865, 870, 871, 875, 900.

___  V.      150, 152, 153.

**05-10577 MLW**

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.
   Ernesto Darquea v. Viisage Technology, Inc., No. 05-CV-10438 MLW

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
   YES ☐    NO **X**

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)
   YES ☐    NO **X**

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
   YES ☐    NO **X**

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
   YES ☐    NO **X**

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
   YES **X**    NO ☐

   A.    If yes, in which division do all of the non-governmental parties reside?
         Eastern Division **X**    Central Division ☐    Western Division ☐

   B.    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
         Eastern Division ☐    Central Division ☐    Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
   YES ☐    NO ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME Theodore M. Hess-Mahan

ADDRESS Shapiro Haber & Urmy LLP, 53 State Street, Boston, MA 02109

TELEPHONE NO. (617) 439-3939

(Viisage Category Form (Martin).wpd - 10/17/02)